IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    Case No. 19-10127-02-JWB

NANA AMARTEY BAIDOOBONSO-IAM,
a/k/a Nana I Am,
a/k/a Nana A. Iam,
a/k/a Nana Amartey Baidoobonsoiam,
a/k/a Nana Baidobonsoiam,

        Defendant.


**MEMORANDUM AND ORDER**

      This matter came before the court on December 20, 2021 for a hearing on pending motions. At the hearing the court addressed Plaintiff's motion for a *Daubert* hearing (Doc. 78), which among other things requested an order excluding testimony from Lawrence M. Asuncion. Asuncion was identified by the defense as an expert "securitization analyst" who will testify on matters relating to securitization of a mortgage loan on property in which Defendant allegedly owned an interest.[1]  (Doc. 74.)  Mr. Asuncion testified via Zoom at the December 20 hearing. After hearing Mr. Asuncion's testimony, the court took the *Daubert* motion under advisement and continued the hearing on the remaining motions, noting that a ruling on the *Daubert* motion will

---

[1] *See Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 930 n.5, 365 P.3d 845, 852 (2016) ("The mortgage securitization process has been concisely described as follows: 'To raise funds for new mortgages, a mortgage lender sells pools of mortgages into trusts created to receive the stream of interest and principal payments from the mortgage borrowers. The right to receive trust income is parceled into certificates and sold to investors, called certificate holders. The trustee hires a mortgage servicer to administer the mortgages by enforcing the mortgage terms and administering the payments. The terms of the securitization trusts as well as the rights, duties, and obligations of the trustee, seller, and servicer are set forth in a Pooling and Servicing Agreement ('PSA').'" (citation omitted).

likely impact some of the remaining motions.  For the reasons stated herein, Plaintiff's motion to exclude the proposed expert testimony of Mr. Asuncion is GRANTED.

### I. Background

A superseding indictment charges Defendant with one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of fraudulently making a false declaration under penalty of perjury in a bankruptcy case, in violation of 18 U.S.C. §§ 152(3) and 2. (Doc. 57.)  It alleges that as part of a scheme to defraud and obtain money and property by materially false and fraudulent pretenses and representations, Defendant caused the delivery by mail of an involuntary petition against an individual to the United States Bankruptcy Court for the District of Kansas, in which Defendant falsely alleged and declared under penalty of perjury that the individual, identified in the superseding indictment as A.S.W. [elsewhere identified as Alan Steven Wolf], was not "generally paying" his debts and owed Gladys Gonzalez the sum of $1,260,000 and Defendant the sum of $630,000.  (*Id.* at 2-3.)

According to allegations in briefs and attachments filed by the parties, the charges relate to a residential property in California referred to as the Whittier Property.  Gladys D. Gonzalez and her husband Jose R. Velasquez allegedly purchased the Whittier Property for $646,400 by signing a Note and Deed of Trust on August 1, 2005.  Defendant asserts that on August 1, 2012, Gonzalez "executed a Deed of Trust granting a $250,000 beneficial interest in the Whittier Property to Homeowners Equity Partnership and Nana I Am."  (Doc. 71 at 4.)

Other documents in the record alleged that Alan Steven Wolf is an attorney in California whose law firm conducted a non-judicial forfeiture of the Whittier property on January 4, 2018. (Doc. 70-2 at 26.)  According to an affidavit of Wolf, by virtue of endorsements and assignments U.S. Bank National Association ("U.S. Bank") was the owner of the note as trustee for Harborview

2005-13, no payments had been made on the loan for over 9 years, and the total amount owed was over $1,025,000.  (*Id.*)  Wolf alleged that Gonzalez and Defendant took various actions to delay the foreclosure, including filing bankruptcy petitions in multiple states.  Also, on June 17, 2017, Gonzales and Defendant filed an action in U.S. District Court for the Central District of California against Wolf and others challenging "the validity of the alleged debt and who actually is the holder-in-due-course since everybody's hands is [sic] in the pot." (Doc. 70-6 at 5.)  Among other things, they demanded that the defendants produce the pooling and servicing agreements under which the mortgage on the Whittier Property was purportedly securitized.  (*Id.* at 6.)  That lawsuit was dismissed with prejudice by an order dated November 14, 2017.  (Doc. 70-10 at 2.)

On or about January 5, 2018 – one day after the foreclosure sale – Gonzalez and Defendant allegedly caused the filing of the involuntary petition in bankruptcy against Wolf in the U.S. Bankruptcy Court for the District of Kansas that is the subject of the superseding indictment.  Wolf alleged that he has no connection to Kansas, did not owe Defendant or Gonzalez any sum, was generally paying his debts, and believed the petition was filed to punish him for conducting the foreclosure sale.  (Doc. 70-2 at 27.)  In the bankruptcy case, pro se filings purportedly signed by Defendant and Gonzalez alleged "that [Wolf] committed fraud by illegally foreclosing on their property on 1/4/2018 without establishing beyond a reasonable doubt that the alleged servicer and beneficiary interest that they are representing are indeed the holder-in-due-course of said property…." (Doc. 70-3 at 3-4.)  The bankruptcy court dismissed the case, finding among other things the petition was defective, there was no proof of any debt owed by Wolf to Gonzalez or Defendant, and the petition was brought for an improper purpose and contained materially false and fraudulent statements.  (Doc. 70-5.)

Defendant's notice of expert testimony asserts that Lawrence M. Asuncion will testify "about the failed securitization of the mortgage loan," "violations of the securitization agreements for the pooling of the Whittier Property loan with other loans ultimately transferred into Harborview Loan Trust 2005-13, the broken chain of title for the Deed of Trust given by Gonzalez and Velasquez to Aegis Wholesale Corporation, the false and invalid assignments of the Deed of Trust, the invalid notices of default and trustee's sale of the Whittier Property, and the … Trustee's … lack of standing in the mortgage securitization." (Doc. 74 at 1-2.) It is also Asuncion's opinion that "the Note was not properly endorsed from one lender to the next or to the Trustee for Harborview Mortgage Loan Trust 2005-13 and the Trustee did not have a legal right to enforce the Note or foreclose on the Deed of Trust." (*Id.* at 2.)

Asuncion's resume asserts that he is "a subject matter expert on the secondary mortgage market involving securitization transactions and structures" and is "employed as a forensic securitization audit and mortgage foreclosure fraud analyst." (Doc. 74-1 at 602.) His resume states that he "hold[s] a degree in Economics" (the resume does not specify where or when the degree was obtained), has more than thirty years "of actual work experience and professional practice in the financial industry," and has "completed numerous courses and earned continuing education credits related to my professional field…." (*Id.*) Asuncion's work experience includes being a registered representative of the National Association of Securities Dealers (NASD) with Series 6 and 22 licenses (from 1985 to 2000) and being chief financial officer and president of Industrial Services Group, LLC (2000 to 2009). Asuncion states he has "focus[ed] my research and study of the Truth in Lending Act (TILA), the Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA), Asset-Backed Securitization and its effects and applications in Foreclosure and Loss Mitigation," and has "been active in foreclosure fraud investigation and

examination of mortgage documents and instruments exclusively for over six (6) years to date." (*Id.* at 603.) Asuncion states that he is "well-versed with the rules and applications of the California Homeowner Bill of Rights" and applies his knowledge of it "to uncover and interpret violations of its provisions as it relates to California foreclosure cases." (*Id.*) Asuncion's resume further states he is "familiar with the industry standards, customs, practices and legal requirements of debt instruments and mortgage loan securitizations" and agreements governing "the securitization trusts and their counterparties including the Trustees and Servicers for the securitization trusts." (*Id.*) It states that Asuncion has written and published a paper entitled "Legal Standing in Foreclosure when the Underlying Mortgage was Securitized," and the paper "has been referred to by attorneys active in the field of mortgage foreclosure litigation," although he does not state where the paper was published. (*Id.*) Asuncion states he has read or reviewed thousands of mortgage loan documents, performs "regular, ongoing research" into the securitization and transfer of mortgage loans and mortgage-backed securities and is "proficient in applying that research to the particular facts in a given foreclosure case." (*Id.* at 604.) Finally, the resume states that Asuncion has "testified and provided expert affidavits and declarations in court proceedings involving foreclosure as an objective Fact-Finder Witness, Fact-Interpreter or Fact-Summarizer." (*Id.*) The resume cites several cases with "a few of my recent Expert Declarations," although no case is identified in which any court found that Asuncion qualifies as an expert witness in mortgage securitization analysis or mortgage foreclosure fraud. (*Id.*)

## II.  Standards

Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Under this rule, the district court must satisfy itself that the testimony at issue is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). The district court must first determine whether the witness is qualified by knowledge, skill, training, experience, or education to render an opinion. *Id*. If so, the district court must determine whether the witness's opinion is reliable by assessing the underlying reasoning and methodology. *Id*. at 1283.

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court identified four factors that trial courts should consider in performing their "gatekeeping" role of determining the reliability of expert testimony: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community. *Id*. at 593–94. "The Supreme Court has emphasized, however, that these four factors are not a 'definitive checklist or test,' and that a court's ... inquiry about reliability 'must be tied to the facts of a particular case.'" *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience, rather than the *Daubert* factors and scientific foundation." *Id*. (citing *Kuhmo Tire Co.*, 526 U.S. at 150) (internal quotation marks omitted). For such testimony

to satisfy the reliability standard, it must be based on actual knowledge, and not mere subjective belief or unsupported speculation. *Id*. (citing, inter alia, *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017)).

The court is not required to admit opinion evidence that is "connected to existing data only by the ipse dixit of the expert," and may exclude the opinion if "there is simply too great an analytical gap between the data and the opinion offered." *Id*. (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

"The court has discretion to determine how to perform its gatekeeping function under *Daubert*." *In re EpiPen*, 2020 WL 1164869, at *3 (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)). The most common method of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co*., 215 F.3d 1083, 1087 (10th Cir. 2000). In this instance, the court conducted a *Daubert* hearing at which Mr. Asuncion appeared via Zoom and testified concerning his qualifications and opinions.

### III.  Analysis

A review of Mr. Asuncion's report (Doc. 74-1) and testimony leads the court to conclude that his testimony should not be admitted.  At the outset, the court notes it is unclear exactly what Mr. Asuncion's education, training, and experience is with respect to examination of securitized mortgages.  He was apparently employed as a registered NASD sales representative with licenses to sell various type of securities from 1985 to 2000, but there is no showing that his work in that

capacity regularly required him to assess whether mortgage-backed securities were properly securitized.  Asuncion testified at the *Daubert* hearing that beginning in 1991 with Mass Mutual he did "due diligence" with respect to insurance and investments.  But when asked specifically about securitization, he said he began concentrating on it about seven years ago.  He testified that the Series 6 and 22 licenses he previously held did not allow the sale of mortgage-backed securities.  Mr. Asuncion's resume indicates he was an officer with Industrial Services Group, LLC from 2000 to 2009.  At the hearing, Asuncion testified this position involved seeking to generate investors in technology and did not involve the sale of securities.  Mr. Asuncion said he subsequently worked for companies involved in wind turbines and other renewable energy sources. Mr. Asuncion's resume states he has now "been active in foreclosure fraud investigation and examination of mortgage documents" for more than six years. (Doc. 74-1 at 606.)  The particular training Mr. Asuncion has undergone to perform this work and the particulars of his work over that period is not spelled out in his resume.

No required training or governing standards are described in the resume (or in Mr. Asuncion's testimony) for persons engaging in securitization audits or foreclosure fraud investigation.  And although Mr. Asuncion describes himself as a "chief" analyst and his report bears a "certification seal," (Doc. 74-1 at 102), it is not clear what those designations signify. Again, no governmental or professional standards governing analysis of mortgage securitization or mortgage fraud investigation are identified. What is clear is that the report is saturated with Mr. Asuncion's opinions about the legal consequences of what he contends was a failure of the mortgagees on the Whittier Property to timely and properly convey and record their purported transfers of interest.  In essence, Asuncion has rendered a title opinion, although he is not a lawyer, he has no apparent legal training or certification in offering title opinions, and his method of legal

analysis is unclear and not shown to be reliable. *See Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 808 (10th Cir. 2016) ("To qualify as an expert, a proposed witness must possess 'such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.'") (citation omitted.)

Mr. Asuncion's report is 160 pages long. The first five pages summarize the initial Whittier Property loan and mortgage transaction. The next 20 or so pages contain a discussion of mortgage securitization generally, diagrams of securitization transactions, and a maze of pronouncements about the validity of transactions relating to the Whittier Property. The source of the legal pronouncements throughout the report is not clear. A portion of the report entitled Mortgage Loan Securitization Forensic Audit describes the methodology Asuncion used to review the "chain of title … as it relates to the ownership history of the borrower's mortgage loan, and whether the purported 'present lender and beneficiary' claiming to own it is supported," which involved reviewing and analyzing "the relevant public land records" and "public and private mortgage-related databases…." (Doc. 74-1 at 25.) Asuncion's discussion of these transactions is difficult to follow due to the report's intermingling of discussions about the Whittier Property specifically and lengthy discussions about mortgage securitization generally.

Included in the report are assertions that the underlying promissory note and deed of trust for the Whittier Property listed Aegis Wholesale Corporation as the lender; that Aegis was acting as a "table lender" (or front) for a "table funder" (wholesale lender), namely Countrywide Home Loans, Inc.; that the deed of trust was recorded in California on August 8, 2005 and listed Commonwealth Land Title as trustee and Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for the lender and its assigns and a nominal beneficiary; and that when

MERS is named as a nominal beneficiary "it is certain that the lender intends to sell such mortgage loan to the secondary market for securitization," and this was "one of the clear indicators that led this auditor to eventually established [sic] that AEGIS WHOLESALE CORPORATION (through COUNTRYWIDE), in fact, sold the subject mortgage loan in a securitization transaction on September 1, 2005 (the MBS [mortgage-backed securities] trust's 'Cut-off Date'")'. (*Id.* at 25, 27.) In subsequent sections, Asuncion asserts that Aegis was required to assign the deed of trust and concurrently endorse the promissory note to Countrywide in order "to validly sell the mortgage loan under its own name," that the Los Angeles County property records reflects no such transfer, and the assignment "was therefore neither effected or perfected - consequently clouding the title to and in the home property securing the loan, and thereby rendering it <u>unalienable</u>." (*Id.* at 63) (emphasis in original). Countrywide in turn bundled the loan and sold it on September 1, 2005 to Greenwich Capital Financial Products, Inc. (GCFP), but allegedly did so without the required assignments and endorsement. (*Id.* at 64.) Immediately thereafter, pursuant to a mortgage loan purchase agreement, GCFP sold the loan to Greenwich Capital Acceptance, Inc, (GCA), but this purported transfer likewise "was ineffective because GCFP … never received the required assignment of DOT and endorsement of the underlying mortgage Note…." (*Id.* at 65.) Pursuant to a Pooling Agreement dated September 1, 2005, GCA created a mortgage-backed securities (MBS) trust – known as a Real Estate Mortgage Investment Conduit (REMIC) – identified as the Harborview Mortgage Loan Trust 2005-13 (or HVMLT 2005-13) under the IRS Code. In exchange for MBS certificates issued by the trust, GCA "sold to and securitized each of the mortgage loans in the pool…." (*Id.* at 66.) U.S. National Bank Association ("U.S. Bank") was named trustee for the benefit of the certificate holders and designated as fiduciary owner of the mortgage loans in the trust. Asuncion contends this sale was likewise made without the required

assignment and endorsement of the underlying note and deed of trust. The certificates were subsequently offered to the public. Asuncion contends the deadline for U.S. Bank to accept contribution of mortgage loans into the trust was no later than 90 days after September 30, 2005, and that examination of Los Angeles County property records fails to show any assignment of the deed of trust for the Whittier Property within that period.

Examples of legal opinions infused in Mr. Asuncion's analysis abound. For example, in the conclusion section of his report (Doc. 74-1 at 98-102), Mr. Asuncion opines:

- That transfer of the mortgage loan by the original lender was "not in compliance with the law requiring recording of an effective transfer" and the lender "cannot dispute … that [it] had long irrevocably sold the subject loan in the securitization transaction;"

- U.S. Bank as trustee was "specifically prohibited from … taking any action … that would jeopardize the REMIC status of the Trust," which would include accepting a transfer more than 90 days after the trust closing date; and this "botched securitization makes it … legally impossible for MERS" or others as a nominee or servicer of the trust "to claim … that the Note [or deed of trust] in any manner was validly assigned," or that MERS or others were "acting as agent or nominee of the unassigned … and now UNKNOWN *present beneficiary and real party in interest* in the mortgage loan;"

- That in order to comply with trust documents and the IRS Code, the trustee for HVMLT 2005-13 was "strictly prohibited" from accepting contribution of a mortgage loan more than 90 days after the trust closing date and any belated transfer "is considered <u>NULL</u> and <u>VOID</u> according to the trust laws of the State of New York," which govern the securitization and trust agreements;

- That all legal and equitable interests in mortgages held in a REMIC trust are vested only in the investor certificate-holders, and if any legal or equitable interest is claimed by anyone else "those that are making those misrepresentations are either defrauding the investors, or the homeowners & courts, or both;"

- That "in the case of a fraudulent transaction the law is well settled" and "[n]umerous authorities have established the rule that an instrument wholly void … cannot be made the foundation of a good title," and "[c]onsequently, the fact that a purchaser acted in good faith in dealing with persons who apparently held title, is not in itself sufficient basis for relief." Moreover,

"[i]t is the general rule that courts have the power to vacate a foreclosure sale where there has been fraud" and "[h]ence, if forged and/or 'robo-signed' signatures are used to obtain the foreclosure, it CERTAINLY makes a difference in non-judicial foreclosure states as well as judicial states;"

- That "[a]ny apparent sale based on invalid and fraudulent documents is void – without any legal effect – like Monopoly Money," and "the law requires that the (true) beneficiary execute and notarize and record a substitution for a valid substitution of trustee to take effect." Thus, "if the Assignment of Deed of Trust/Mortgage is fraudulent, the sale is void," and although the process of evicting persons based on these documents "is mostly a 'rubber stamping' by skeptical judges," "once these documents make it into court, the bank officers and lawyers become guilty of FELONIES;"

- That the "unclean hands rule requires that the Plaintiff not cheat, and behave fairly," and whether the doctrine applies "is a question of fact." One "majorly overlooked facet is the extremely active bankruptcy court proceedings, where, just as in judicial foreclosure states, the banks must prove 'standing' to proceed with a foreclosure. If they are not signed by persons with the requisite knowledge, affidavits … are perjured." Thus, "[v]erified eviction complaints, perjured motions for summary judgment, and all other eviction paperwork after a nonjudicial foreclosure involving fraudulent documents are illegal and void." The clean hands doctrine may "not be used to put in issue conduct of the plaintiff unrelated to plaintiff's claim," so "plaintiff's unrelated corrupt actions … would be irrelevant."

- "No documentation was provided to this examiner nor did any appear in the record of the county recorder that establishes that the subject mortgage loan was validly assigned and legally transferred by original lender" Aegis or others, and "[t]his creates a triable issue of fact as to who the lawful owner and holder of the Note truly is."

- "U.S. Bank, as Trustee, … does not have any legal standing in and to this mortgage loan; and not one of the named parties here legally acquire[d] this loan." "Therefore, subject to the mortgagors' own attorney's interpretation of the law (as it applies to their specific situation) and legal advice, it can be legally argued that COUNTRYWIDE SERVICING [and others] collected mortgage payments on the loan without any standing to do so, and thereby also exposed the mortgagors to a financial double jeopardy for having paid the wrong party…." "Moreover, the foreclosure action by party [sic] without any legal standing is unlawful and wrongful."

(Doc. 74-1 at 98-100.)

As the foregoing illustrates, nearly all of Mr. Asuncion's opinions not only touch upon legal standards but are fundamentally based on legal conclusions. Yet no showing is made that

12

Mr. Asuncion has the requisite knowledge, training, or experience to reliably opine on legal issues surrounding securitization of mortgages or property titles.  In fact, the report ends with a disclaimer that legal advice "must be tailored to the circumstances of each case and … [the] information provided may not be an appropriate fit in this instant case," adding that the report "is for educational and informational purposes only and specifically is not legal advice or legal opinions." (*Id.* at 102.)  Even assuming Mr. Asuncion has substantial knowledge concerning the steps involved in securitizing mortgages, the vast majority of his proposed testimony – and the purported relevance of it in this case – pertains to the legal consequences of the steps that were taken regarding the Whittier Property, a matter clearly outside his area of knowledge or expertise.  An expert who possesses knowledge as to a general field but lacks specific knowledge "does not necessarily assist the jury;" proposed expert testimony "must therefore 'fall within the reasonable confines of [the witness's] expertise." *Taber*, 642 F. App'x at 807 (citations omitted).

For all of the foregoing reasons, the court concludes Defendant has not shown that Mr. Asuncion is qualified by knowledge, experience, training, or education to express opinions on the legal validity or invalidity of transfers of interest of the Whittier Property mortgage or note, or to express legal opinions about which persons or entities do or do not hold enforceable interests in the property.  His testimony is excludable on that basis alone.  *Cf. Siegel v. Ble Giant Equip. Corp.*, 793 F. App'x 737, 742 n.4 (10th Cir. 2019) ("Because the admissibility of expert testimony involves a two-part test, *see Nacchio*, 555 F.3d at 1241, the district court could have stopped after it determined Dr. Block was not qualified at the first step of the test….")

Even if the court determined that Mr. Asuncion's experience and self-study of mortgage securitization provided a sufficient basis for offering such opinions, no showing has been made that Mr. Asuncion's opinions are the product of a reliable method.  Most of Mr. Asuncion's legal

assertions are unsupported by any citation to legal authority.  With respect to citations that are included, a number do not involve New York or California law and are not applicable to the Whittier Property.  Some of the cites provided – none of which appear to be dated within the last few years – are of uncertain validity.  For example, a significant point apparently underlying many of Mr. Asuncion's opinions is that any purported transfer of the Whittier Property note or deed of trust to HVMLT 2005-13 after the trust closing date rendered the purported transfer void as opposed to merely voidable under New York law.  *See e.g.,* Doc. 74-1 at 97 ("If the mortgage securitization occurs beyond the 90 days (as in the instant case), it is considered void at its inception.")  But no showing is made that Mr. Asuncion conducted a thorough survey of relevant authorities on that question.  For example, the report cites *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 940–41, 365 P.3d 845, 859 (2016), in which the California Supreme Court concluded that a party has standing to claim a wrongful foreclosure where the foreclosing party's interest "was not merely voidable but void, depriving the foreclosing party of any legitimate authority to order a trustee's sale."  *Id.*, 365 P.3d at 861.  But subsequent cases have noted that *Yvanova* did not decide whether the particular transfer at issue in that case was in fact void and that "numerous state and district courts that have analyzed the effect of New York law on post-closing date acquisitions [by securitized trusts] … have concluded that such transfers are voidable rather than void."  *See Renard v. JP Morgan Chase Bank, N.A.*, No. 17-820, 2017 WL 8292774, at *7 (C.D. Cal. Dec. 13, 2017) (citing cases); *Est. of Brown v. Bank of New York*, No. 18-1973, 2018 WL 10435665, at *4 (C.D. Cal. Dec. 3, 2018) (citing *Mendoza v. JPMorgan Chase Bank, N.A.*, 6 Cal. App. 5th 802, 815 (Ct. App. 2016) ("Two post-*Yvanova* California appellate courts, in published opinions, have embraced the emerging consensus that assignments, which allegedly violated PSA's and federal law are voidable rather than void, and as a result, borrowers do not have

standing to challenge late transfers or other defects in the securitization process."); *Sigaran v. U.S. Bank Nat. Ass'n,* 560 F. App'x 410, 414 (5th Cir. 2014) (New York courts have treated ultra vires actions by trustees as voidable and capable of ratification; therefore "[t]he assignment of the [plaintiffs'] loan after the closing date makes that assignment voidable, not void, and thus [the plaintiffs] lack standing to challenge the assignment under New York law."); *Ciccone v. Flagstar Bank, FSB,* 2017 WL 10456859, * 5 (E.D. N.Y. Jan. 9, 2017) (plaintiff challenges "the securitization process by alleging that the assignment(s) of the Note and/or Mortgage failed to comply with … provisions of the PSA and/or New York State law governing trusts, and is/are therefore void," but plaintiff "lacks prudential standing to mount a challenge to the securitization … on these bases.")  Such decisions are not addressed in the report, and no showing is made that Mr. Asuncion conducted a reliable review of relevant law on these issues.  The point here is not whether Mr. Asuncion's opinions are correct or incorrect insofar as the legal effect of a purported transfer is concerned; the point is Defendant has not shown that Mr. Asuncion's opinions rest on a reliable foundation.

Mr. Asuncion's opinions on a host of other matters similarly are not shown to be based on reliable methods.  For example, Exhibit 406 is a copy of an assignment of the deed of trust on the Whittier Property recorded August 8, 2011. The form indicates the assignment was made at the direction of MERS "by Martha Munoz, Vice President."[2] At the *Daubert* hearing, Mr. Asuncion stated he could testify "with certainty" that Munoz was not an employee of MERS and was not authorized to sign on behalf of MERS.  When asked how he knew, Mr. Asuncion answered,

---

[2] *Cf. Yvanova*, 365 P.3d at 853  ("As the *Culhane* court explained, MERS was formed by a consortium of residential mortgage lenders and investors to streamline the transfer of mortgage loans and thereby facilitate their securitization. A member lender may name MERS as mortgagee on a loan the member originates or owns; MERS acts solely as the lender's 'nominee,' having legal title but no beneficial interest in the loan. When a loan is assigned to another MERS member, MERS can execute the transfer by amending its electronic database. When the loan is assigned to a nonmember, MERS executes the assignment and ends its involvement. (*Culhane*, *supra*, 708 F.3d at p. 287.)"

"Through the research," and referred to his report.  In the report (Doc. 74-1 at 70-76), Mr. Asuncion asserted that Munoz was "an allegedly well-known 'robo-signer'" employed by Bank of America, N.A. In support of that assertion, he cited a 2014 "published report" of "DK Consultants LLC," a document that was apparently uploaded to the website of Osceola County, Florida. (*Id.* at 71).  The court has no idea what this report is or where it came from.[3]  From this premise, Mr. Asuncion concludes the assignment "was a self-dealing transaction, clearly a conflict of interest" because Bank of America was the loan servicer of the trustee for HVMLT-13.  He proceeds to a cite a purported deposition of a MERS vice president concerning the corporate structure of MERS (including a description of entities labeled MERS 1, MERS 2, MERSCORP, and MERS 3), from which Mr. Asuncion concludes that under MERS's structure and bylaws, the MERS vice president "acted without approval from the MERS Board of Directors when he authorized a massive army of alleged non-employee 'Officers,' including Martha Munoz, to execute various assignments of deeds of trust...."  (*Id.* at 73.)  The report later concludes:

> WHY does the Lender use MERS in assignments? Because MERS has been played off into every court in America that it is a legitimate "thing," when it is anything BUT.  MERS is a shell corporation made up of a bunch of corporate shills.  It has no assets, no liabilities, no employee... MERS is the name of the business model that is owned by MERSCORP Holdings, Inc. MERSCORP is NOT listed in the mortgage or deed of trust.  WHY do these people claim they are officers of MERS when they are really employees of the servicer? Because as long as the truth is withheld from the judge, MERS continues to ply its misrepresentations in the system and the longer it continues to say in the business! That's WHY?

---

[3] The assertion that Munoz's signature on assignments was a robo-signature, unauthorized, or a forgery has been similarly raised in a number of cases.  *See e.g., Reed v. Bank of Am., N.A.*, No. CV H-15-2005, 2016 WL 3058303, at *4 (S.D. Tex. May 31, 2016) ("Reed also argues that, since the court dismissed this case, his attorney has found newly discovered evidence that substantiates his forgery allegations. Dkt. 17 at 10. Reed points to a records audit from Osceola County, Florida that states that Martha Munoz is a "known robosigner." *Id.* * * * Even considering the report, it simply makes the conclusory statement that Martha Munoz is a "known Bank of America robosigner." Dkt. 17-1 at 251. The report offers no support for this allegation. Moreover, the report is no evidence that the assignments at issue in this case were forged.")

(*Id.* at 75.)   This is advocacy, not analysis.  The report does not show that the assertions contained therein are well-supported by reference to reliable or first-hand sources of information.

In addition to these shortcomings, there is a substantial disconnect between the issues the jury will have to decide and Mr. Asuncion's opinions about securitization of the Whittier Property mortgage.  The elements of the offenses charged turn largely upon Defendant's state of mind and whether he had an intent to defraud and knowingly and falsely represented that Wolf was generally not paying his debts and owed Gladys Gonzalez the sum of $1,260,000.00 and Defendant the sum of $630,000.  (Doc. 57 at 2-3.)   Nothing in Mr. Asuncion's report has any direct bearing on Defendant's state of mind.   Defense counsel essentially argued at the *Daubert* hearing that Asuncion's testimony would indirectly bear on Defendant's state of mind by substantiating that Defendant was not making up his belief that the foreclosure was improper and that there was in fact a problem with it.   But any connection between Asuncion's opinions and what Defendant knew or believed about the foreclosure is largely speculative.[4]   Moreover, Asuncion's opinions have no apparent connection to Defendant's alleged representations that Wolf was generally not paying his debts as they became due or that he owed Defendant the sum of $630,000, or to any belief by Defendant that a defect in the foreclosure entitled him to file an involuntary bankruptcy petition against Wolf in Kansas.  On top of this, Asuncion's opinions include so many unsupported and confusing assertions that his testimony would result in confusion of the issues and undue delay, which would substantially outweigh any possible probative value of the testimony.  Thus, even if this evidence were not excluded under Rule 702, it would be excluded under Rule 403.  In sum,

---

[4] Defendant's notice of expert testimony stated that "Mr. Asuncion may also testify as a lay witness concerning his personal first-hand knowledge of the defendant and the defendant's experience with securitization practices and processes.  (Doc. 74 at 2.)  This apparently refers to the possibility that Defendant attended a seminar given by Mr. Asuncion some time before the acts alleged in the indictment.   The court makes no findings concerning the admissibility of such lay testimony; the instant motion only addresses expert opinion testimony by Asuncion.

when Asuncion's opinion testimony is considered in the context of the allegations in the indictment and what the jury must decide, the court concludes the testimony would not assist the jury in deciding a fact in issue.

**IV. Conclusion**

Plaintiff's motion for *Daubert* hearing (Doc. 78) is GRANTED.  The expert testimony of Lawrence M. Asuncion proffered by Defendant is excluded pursuant to Fed. R. Evid. 702.  IT IS SO ORDERED this 18th day of January, 2022.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE